```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF NEW JERSEY


TRACY L. OSBOURNE,              :    HONORABLE JOSEPH E. IRENAS
                                :
      Plaintiff,                :    Civil Action No. 05-0355 (JEI)
                                :
      v.                        :
                                :           OPINION
JO ANNE B. BARNHART,            :
Commissioner of Social          :
Security,                       :
                                :
      Defendant.                :
                                :
```

**APPEARANCES:**

WOLF & BROWN L.L.C.
By: Philip Wolf, Esq.
228 Kings Highway East
Haddonfield, NJ 08033
      Counsel for Plaintiff.

CHRISTOPHER CHRISTIE, UNITED STATES ATTORNEY
BY: Kimberly L. Schiro, Esq.
Special Assistant U.S. Attorney
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278-0004
      Counsel for Defendant.


**Irenas**, Senior District Judge:

   Tracy L. Osbourne ("Osbourne") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g) and Section 1634(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), for review of the final determination of the

1

Commissioner of Social Security ("Commissioner") denying Osbourne's application for Social Security Disability Insurance Benefits.  For the following reasons, this Court affirms the Commissioner's decision.

**I.**

On April 11, 2002, Osbourne filed an application with the Social Security Administration ("SSA") for a period of disability and disability insurance benefits.[1] (R. at 93.)  She alleged an inability to work as of July 1, 2001. (R. at 102.)  The SSA denied Osbourne's application on September 10, 2002, and subsequently denied her request for reconsideration on January 8, 2003. (R. at 38, 44.)

Osbourne appealed the denial of her claim and requested a hearing. (R. at 47.)  The hearing was held before an Administrative Law Judge ("ALJ") on September 23, 2004, in Voorhees, New Jersey. (R. at 329.)  ALJ Christopher K. Bullard issued a decision on October 4, 2004, holding that Osbourne "is not disabled within the meaning of the Social Security Act" and was not "under a 'disability,' as defined in the Social Security Act, at any time through the date of this decision." (R. at 15, 24.)

---

[1] Osbourne previously filed an application with the SSA on September 24, 2001. (R. at 90.)  The SSA denied Osbourne's initial application on November 30, 2001. (R. at 33.)  Osbourne does not appear to have appealed the denial.

On October 22, 2004, Osbourne requested review of the ALJ's decision by the Appeals Council of the SSA, which denied her request for review on November 26, 2004. (R. at 7, 11.)  ALJ Bullard's decision thus stands as the final decision of the Commissioner.  Osbourne filed her appeal with this Court on January 20, 2005.

**II.**

Osbourne is a thirty-seven year old female residing in Collingswood, New Jersey. (R. at 108.)  She has a high school education and her past work experience includes employment as a housekeeper supervisor, fast food supervisor, laundry laborer, and janitor. (R. at 16.)

In her April 11, 2002, SSA Application, Osbourne alleged that interstitial cystitis,[2] hypertension, depression, headaches, and back pain limit her ability to work. (R. at 136.)  Osbourne was treated for her interstitial cystitis by Dr. Richard Caraballo and underwent an interstim transplant[3] on November 13, 2001. (R. at 209.)  She was released by the doctor to return to

---

[2] Interstitial cystitis is defined as "a condition of the bladder occurring predominantly in women, with an inflammatory lesion . . . involving the entire thickness of the [bladder] wall.  The lesions . . . may heal superficially, and are notoriously difficult to detect.  Typically, there is urinary frequency and pain on bladder filling and at the end of micturition." *Dorland's Illustrated Medical Dictionary* 420 (28th ed. 1994).

[3] A device was surgically implanted within Osbourne's body to affect her bladder and prevent frequent urinary incontinence. (R. at 187, 222, 239.)

work after December 13, 2001. (R. at 222.)  The doctor advised her not to lift more than ten pounds or engage in pushing or pulling activities. (R. at 213, 222.)  In a follow-up letter dated March 14, 2002, and addressed to Dr. Ances (Department of Obstetrics and Gynecology), Dr. Caraballo reported that Osbourne attested to feeling an "amazing improvement with her urinary urgency and frequency" and only experiences "occasional flares" of pain. (R. at 209.)

In an August 13, 2002, evaluation, Dr. Deborah Bricker[4] described Osbourne's hypertension as non-problematic. (R. at 227.)  Dr. Bricker also determined that Osbourne's depression "may affect her ability to focus on work," although she responded well to Paxil[5] and had a fair prognosis. (R. at 227.)

In addition to Dr. Bricker's evaluation, Osbourne had on multiple occasions been diagnosed with major depression and a history of suicidal ideation. (R. at 240, 291, 295.)  On July 19, 2002, Dr. Joseph Mobilio performed a consultative examination for the Department of Labor and determined that Osbourne possessed a

---

[4] Dr. Bricker is Osbourne's family physician (R. at 18.)  It appears that Dr. Bricker has since changed her name to Deborah Malone. (R. at 297.)

[5] Paxil (paroxetine or paroxetine hydrochloride) is an orally administered psychotropic drug used in the treatment of major depressive disorder, social anxiety disorder, obsessive compulsive disorder ("OCD"), panic disorder ("PD"), generalized anxiety disorder ("GAD"), and posttraumatic stress disorder ("PTSD"). GlaxoSmithKline, http://us.gsk.com/products/assets/us_paxil.pdf 1,2 (last visited June 21, 2006).

Global Assessment of Functioning ("GAF") in the mid 40's.[6] (R. at 241.)  He stated in his report that Osbourne would benefit from aggressive psychopharmacological interventions and psychotherapy. (R. at 240.)  Dr. Mobilio noted that Osbourne had not been sufficiently motivated to seek psychiatric or psychological help at any prior time. (R. at 240, 241.)  He "rule[d] out the possibility that her depression may be part of a mixed bipolar disorder . . . ." (R. at 240.)  In addition, he found Osbourne capable of comprehending and following instructions, able to manage calculations when given a chance to write the numbers down, and devoid of delusions and hallucinations. (R. at 240, 241.)  Dr. Mobilio opined that Osbourne "did not put much effort into cognitive assessment . . ." and had minimal insight. (R. at 240.)  He observed Osbourne's gait to be normal despite her claims of severe osteoarthritis and her occasional usage of a cane. (R. at 241.)

After seeing Dr. Mobilio, Osbourne obtained psychiatric care from Dr. Peter Quinteri.  Her treatment included both prescription medication and intensive psychotherapy. (R. at 290-293.)  On August 13, 2003, Osbourne began attending weekly sessions with psychotherapist Dorothy Brocco. (R. at 295.)  By

---

[6] The Global Assessment of Functioning is an evaluation tool used in the DSM-IV multiaxial assessment to rate an examinee's overall level of functioning.  See DSM-IV at 30. An individual falling between 41 and 50 on the GAF scale experiences "[s]erious symptoms . . . or any serious impairment in social, occupational, or school functioning." Id. at 32.

December 2003, Osbourne had improved her depressed mood and was no longer experiencing suicidal thoughts or self-injurious behavior. (R. at 293, 295.)  While testifying before the ALJ, Osbourne complained that her psychiatric medications cause her to experience feelings of tiredness, dizziness, and drowsiness. (R. at 340.)

Osbourne completed a "Headache Questionnaire" on May 22, 2002. (R. at 149.)  On the questionnaire, she claimed that she endured frequent headaches and that she ingests a daily dose of Paxil and Excedrin Migraine tablets as needed. (R. at 149.)  On November 12, 2002, Osbourne obtained an orthopedic consultation from Dr. Mark Reiner regarding her claim of chronic back pain. (R. at 267.)  Dr. Reiner's impressions were: degenerative lumbar disc disease with sciatica, hypertension, and asthma. (R. at 18, 268.)  He noted that Osbourne had satisfactory range of motion of the cervical spine and lower extremities, a range of motion of the lumbar spine that was 80% of normal, an intact range of motion to the upper extremities, and intact neurovascular status to the upper and lower extremities. (R. at 19, 268.)

The record also contains complaints of obesity, status post interstim implant,[7] asthma, tibial tendon dysfunction and pars

---

[7] Status post interstim implant refers to Osbourne's condition after undergoing surgery and treatment for her interstitial cystitis.  The record provides documentation of Dr. Caraballo's postoperative evaluations and advice. (R. at 209-222.)

6

planus.[8] (R. at 16-17.)  The record varies with regard to Osbourne's weight, ranging from 196 to 215, and height, ranging from 5' 1/2" to 5' 4".  She claims to have gained in excess of 150 pounds since 2001.[9] (R. at 290.)  Osbourne testified that her primary care physician prescribed an Albuterol inhaler to treat her asthma. (R. at 333.)  On July 26, 2004, Osbourne underwent surgery on her left foot to treat her tibial tendon dysfunction and pars planus. (R. at 321.)  She was subsequently placed in a cast,[10] takes prescription medication, and according to her surgeon, Dr. David Kraatz, Osbourne is "doing well" and continues to check in for follow-up visits. (R. at 325.)

### III.

This Court reviews the decision of the ALJ to determine whether there is substantial evidence on the record to support the ALJ's decision.  *See* 42 U.S.C. § 405(g); *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (citing *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994)).  Any finding of fact made by the ALJ shall be conclusive if it is supported by substantial evidence.

---

[8] Osbourne was experiencing pain and discomfort in her left ankle. (R. at 325.)  She was diagnosed and treated for posterior tibial tendon dysfunction and pars planus by Dr. David Kraatz. (R. at 321, 325.)

[9] The record does not explain how Osbourne arrived at a value of 150 pounds, given the weight range in her medical records.

[10] Osbourne testified that she stopped wearing the prescribed cast prior to the September 23, 2004, hearing held before ALJ Bullard. (R. at 340.)

42 U.S.C. § 405(g). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate." *Plummer*, 186 F.3d at 427.

**IV.**

**A. The Five-Step Sequential Evaluation**

The SSA uses a five-step sequential evaluation process to determine whether an individual is disabled. 20 C.F.R. § 404.1520. In *Plummer v. Apfel*, the Third Circuit described the five-step evaluation:

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § 1520(a). If a claimant is found to be engaged in substantial activity, the disability claim will be denied. *Bowen v. Yuckert*, 482 U.S. 137, 140, 107 S.Ct. 2287, 2290-91, 96 L.Ed.2d 119 (1987). In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520©. If the claimant fails to show that her impairments are "severe," she is ineligible for disability benefits.
>
> In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to her past relevant work. *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). If the claimant is unable to resume her former occupation, the evaluation moves to the final step.
>
> At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim

> of disability.  20 C.F.R. § 404.1520(f).  The ALJ must show
> there are other jobs existing in the national economy which
> the claimant can perform, consistent with her medical
> impairments, age, education, past work experience, and
> residual functional capacity.  The ALJ must analyze the
> cumulative effect of all the claimant's impairments in
> determining whether she is capable of performing work and is
> not disabled.  *See* § 404.1523.

*Plummer*, 186 F.3d at 428.  If a determination about a claimant's disability can be made at any step in the sequential evaluation, the analysis is concluded without continuing on to any remaining steps.  20 C.F.R. § 404.1520(a)(4).

## B. The ALJ's Opinion

ALJ Bullard held that Osbourne was "not under a disability, as defined by the Social Security Act, at any time through the date of this decision, [October 4, 2004]." (R. at 24.)  The ALJ also concluded that Osbourne is not entitled to a period of disability or disability insurance benefits under Sections 216(I) and 233 of the Act. (R. at 24.)  This determination was reached after proceeding through all five steps of the sequential evaluation.  Upon review of the record, this Court concludes that the ALJ's findings are supported by substantial evidence as required under Section 405(g) and *Plummer*.

In the first step, the ALJ found that Osbourne had not engaged in substantial gainful activity since the alleged onset date of her disability. (R. at 16.)  ALJ Bullard determined in the second step that Osbourne is severely impaired as a result of

9

the following medical conditions: interstitial cystitis, hypertension, obesity, depression, status post interstim implant, and asthma.[11] (R. at 17.)  To obtain a designation of severe impairment, Osbourne must be significantly limited either physically or mentally in her ability to do basic work activities.  20 C.F.R. § 404.1520 (c).

The ALJ's analysis of the evidence at each of the first two steps was extremely brief.  However, it is clear from reviewing the record that these findings are supported by substantial evidence.  The ALJ's decision, his findings, and the available earnings records indicate that Osbourne has not worked since her alleged onset date of July 1, 2001. (R. at 16, 97-100, 102, 136.) The medical reports contained within the record verify that Osbourne's physical and mental status is consistent with the findings made in step two.

In the third sequential step, the ALJ found that Osbourne's "medically determinable impairments do not meet or medically equal one of the listed impairments" set forth in 20 C.F.R. § 404, Subpt. P, App. 1. (R. at 23.)  He noted that "no treating or examining physician has mentioned findings equivalent in

---

[11] The ALJ noted that Osbourne's tibial tendon dysfunction and pars planus were severe impairments but were not expected to last for twelve continuous months. (R. at 17.)  Additionally, Osbourne's back pain was not considered by the ALJ to be a severe impairment because there was "no evidence or allegations that this impairment imposes any limitations on . . . [her] ability to perform basic work-related activities." (R. at 17.) Osbourne does not challenge these determinations.

10

severity to the criteria of any listed impairment." (R. at 17.) Guided by the testimony of Dr. Richard Cohen,[12] the ALJ stated that Osbourne "had a severe affective disorder, but that it did not meet the criteria of Listing 12.04." (R. at 20.)

With the exception of ALJ Bullard's specific mention of Osbourne's claim of depression under Listing 12.00, Mental Disorders, neither he nor Osbourne suggest or discuss listings under which her other impairments might be evaluated.  While the brevity of the ALJ's step three analysis leaves much to be desired, the opinion does provide sufficient development of the record for the Court to conduct meaningful judicial review of the determination at step three.  After such review, this Court determines that the record contains no evidence suggesting that Osbourne would meet or medically equal any of the listed impairments in 20 C.F.R. § 404, Subpt. P, App. 1.

In step four, the ALJ concluded that Osbourne is unable to perform any of her past relevant work. (R. at 23.)  The ALJ performed an extensive analysis of the medical reports and other relevant documentation contained within the record to determine Osbourne's residual functional capacity.[13]  Specifically, the ALJ reviewed medical evaluations and psychological reports generated

---

[12] Dr. Cohen reviewed Osbourne's medical records on behalf of the SSA.

[13] "Residual functional capacity" is defined as the most that an individual can still do in a work setting despite any physical or mental limitations. 20 C.F.R. § 404.1545(a).

11

by Dr. Richard Caraballo, Dr. Deborah Brickman, Dr. Joseph Mobilio, Dr. Mark Reiner, Ms. Dorothy Brocco, Dr. Peter Quinteri, Dr. David Kraatz, and testimony from Dr. Richard Cohen.  The reports and testimony of these specialists and general medical practitioners addressed Osbourne's interstitial cystitis, interstim implant and follow-up, history of hypertension, depression, headaches, asthma, weight gain, suicidal ideation, back pain, range of motion, and her tibial tendon dysfunction and pars planus. (R. at 19.)

Based on his analysis of this evidence the ALJ found that Osbourne retains the following residual functional capacity:

> lift and carry ten pounds occasionally and less than ten pounds frequently, sit for about six hours (in one hour increments), stand for about two hours (in fifteen minute increments), walk for about one hour (in fifteen minute increments) and can only occasionally climb stairs, balance or stoop; and was totally prohibited from climbing ladders, and could only occasionally relate[] to co-workers, public or supervisors and could only understand, remember and carry out simple instructions and perform simple repetitive tasks.

(R. at 21.)  The ALJ determined that this residual functional capacity was insufficient to permit Osbourne to return to her past work.

The testimony of vocational expert, Mitchell Schmidt, supports the ALJ's determination that Osbourne cannot perform any of her past relevant work. (R. at 21.)  Mr. Schmidt was presented with hypothetical questions assuming an individual of Osbourne's

age, education, past relevant work, and residual functional capacity. (Id.)  He responded that such an individual as was hypothetically presented could not return to any of Osbourne's past relevant work. (Id.)  The Court concludes that the ALJ's determination at step four is supported by substantial evidence.

At step five, the ALJ examined the cumulative affects of Osbourne's impairments, age, educational background, work experience, residual functioning capacity, and the testimony of the vocational expert.  Incorporating all of these factors, the ALJ determined that Osbourne is capable of performing work and is not disabled. (R. at 22.)  Specifically, the ALJ deduced that Osbourne "is capable of performing a significant range of sedentary work as defined in 20 C.F.R. § 404.1567,"[14] and that there are a significant number of jobs in the national economy that Osbourne is capable of performing. (R. at 22, 24.)  Mr. Schmidt, the vocational expert, testified that an individual in a position similar to Osbourne's could "work as an addresser (572,000 jobs in the U.S. and 916 in the region), or as a plastic design applicator (43,680 jobs in the U.S. and 170 jobs in the region), or as a microfilm document preparer (140,000 jobs in the

---

[14] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

U.S. and 140 jobs in the region)." (R. at 21 (summarizing Schmidt's testimony.))

Osbourne objects to the ALJ's conclusion that she could perform other jobs in the national economy.  Osbourne claims that ALJ Bullard did not consider that she would be required to take frequent, unscheduled breaks to use the restroom during the work day, and is therefore unable to perform any job.  The record does not provide medical evidence to support her claim that she would need to take frequent breaks to use the restroom.  Dr. Caraballo's March 14, 2002, follow-up letter emphasizes Osbourne's improved status post interstim implant.  (R. at 209.)  He specifically states that ". . . she is currently voiding approximately 5 to 6 times per day, has no nocturia whatsoever and no urgency." (Id.)

Additionally, Osbourne argues that the ALJ has failed to properly evaluate the combined effects of her impairments. (Pl's Br. At 9.)  ALJ Bullard's opinion clearly reflects that a complete review was made of the evidentiary record and Osbourne's testimony.  ALJ Bullard determined that Osbourne's testimony regarding her impairments was not credible.  While Osbourne contests the ALJ's assessment of her credibility, the Court notes that her testimony regarding her pain and difficulties due to her interstitial cystitis is contradicted by her own statements to her doctor.  Her treating psychotherapists and psychiatrists

14

indicate that her psychiatric condition has improved with medication and therapy. Furthermore, "a claimant's subjective statements about pain or other symptoms, without more, cannot be the basis for a disability." *Jaramillo v. Commissioner*, 130 F. App'x 557, 562 (3d Cir. 2005).

Moreover, Osbourne has offered no other evidence that suggests that her combined impairments would be medically equivalent to a listed impairment. *Ballardo v. Barnhart*, 68 F. App'x 337, 338 (3d Cir. 2003) ("However, a claimant bears the burden of producing evidence that her impairment is equivalent to a listed impairment, and equivalence to a listed impairment must be determined on the basis of medical findings 'supported by medically acceptable clinical and laboratory techniques.'")(citations omitted). Accordingly, this Court finds that the ALJ's decision was supported by substantial evidence.

**V.**

For the aforementioned reasons, the Court will affirm the final decision of the Commissioner denying Osbourne's application for disability benefits. The Court will issue an appropriate order.

Date: ___July 14___, 2006

<u>s/*Joseph E. Irenas*</u>
JOSEPH E. IRENAS, S.U.S.D.J.

15